No. 298                    May 8, 2024                    467

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of A. D. F. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. L. B.,
*Appellant.*

Jackson County Circuit Court
23JU00082; A182137 (Control)

In the Matter of Y. L. M. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. L. B.,
*Appellant.*

Jackson County Circuit Court
23JU00084; A182138

In the Matter of N. Z. E. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. L. B.,
*Appellant.*

Jackson County Circuit Court
23JU00085; A182140

Benjamin M. Bloom, Judge.

Submitted February 5, 2024.

G. Aron Perez-Selsky and Michael J. Wallace filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Shannon T. Reel, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Mother appeals from judgments terminating her parental rights to each of her three children, A, Y, and N, based on unfitness, ORS 419B.504.[1] On appeal, mother does not challenge the juvenile court's determination that she is unfit, but argues that the evidence is not sufficient to support the court's determination that termination of her parental rights is in A's, Y's, and N's best interest as required by ORS 419B.500. On *de novo* review, ORS 19.415(3)(a), we conclude that termination is in the children's best interests given mother's conduct and mental health conditions, their ongoing effects on the children, the insecurity of their attachment to her, and the reasons for concern regarding mother's capacity to cooperate with a permanent guardianship. Accordingly, we affirm.

Our *de novo* standard of review for termination cases "requires us to examine the record with fresh eyes to determine whether the evidence developed below persuades us that termination is in [the children's] best interest," which the Department of Human Services (DHS) must establish by clear and convincing evidence. *Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750, 432 P3d 1186 (2018), *rev den*, 365 Or 556 (2019).

Based on that standard, we briefly recount the relevant facts, beginning with some background facts. Mother's family's history with DHS began in 2016 when DHS removed A, then mother's only child, from parents' care when A was about seven months old, based on allegations of failure to thrive. Shortly after A's return to mother's care in 2017, DHS again removed A, along with a second child, Y, then six months old, based on allegations which included that parents had exposed the children to domestic violence. Both removals resulted in the juvenile court exercising jurisdiction over the children. A and Y returned to parents' care in December 2018, after 20 months in substitute care.

Prior to A's and Y's return, mother was diagnosed with bipolar II disorder. The evaluator observed, among

---

[1] Father is not a party in this appeal. Prior to the termination trial, he relinquished his parental rights to all three children.

other things, that mother easily lost her temper and struggled with parenting skills. Mother engaged in services, including parenting classes and dialectic behavioral therapy. The dependency case was closed based on DHS's request, and mother decided to relocate to Ohio with the children to be close to her relatives, including her sister, who helped mother with the children in Ohio and who is the prospective adoptive parent in this case.

Mother's family eventually moved back to Oregon and, in 2020, DHS removed A for a third time, along with Y and N, mother's youngest child, based on allegations that mother physically abused the children. Mother admitted to police that she bit A on the buttocks and occasionally bit the other children's fingers, and ultimately pled no contest to fourth-degree assault.[2] The juvenile court took jurisdiction over the children, placed them in nonrelative substitute care, and set up a plan for reunification with a concurrent adoption plan. After a contested permanency hearing held in 2022, about two years after that third removal, the court changed the reunification plan to adoption. The children, who had been in multiple and separate placements, were living together in a stable placement with mother's sister for about a year and a half by the time of the termination trial. She wishes to adopt them.

During the course of the proceedings, mother and the children participated in individual psychological evaluations and received various services, including mental health counseling. Though mother denied abusing the children, she admitted that they experienced trauma in her home and asserted that she "take[s] some responsibility" for that trauma. In her view, "at least 60" percent of the children's mental health issues "come[] from their dad" and "30/40" percent come from her actions "dealing with their dad."

Mother has been diagnosed with several mental health conditions, including bipolar II disorder, as stated above, and other personality disorder with paranoid, narcissistic, and borderline traits. Those conditions have impacted

---

[2] Although mother denied abusing the children at trial, the juvenile court found credible the investigating officer's testimony regarding mother's admissions to biting all three children. We defer to that credibility finding.

mother's capacity to control her behaviors and take accountability for how her conduct led to removal of the children. Although mother was prescribed medication for bipolar II disorder, she denies that she suffers from that disorder and stopped taking the prescribed medication. Mother's evaluators, psychologists Daniel Munoz and Claudia Lake, testified regarding the ways that mother's mental health conditions interfere with her ability to prioritize the needs of her children and expressed concern that, despite treatment, her conditions have not improved over time.

Moreover, evaluators, including Munoz, Lake, and two other psychologists who evaluated the children, as well as mother's sister, testified to the ongoing impacts of trauma on all three children. A needed counseling to process trauma connected to mother's assault. When he first moved into mother's sister's home, he was very destructive after visits with mother, would be up very late, was very emotional and crying, and would destroy things in his room. Y also experienced trauma from her experiences of neglect and exposure to domestic violence and struggled with poor boundaries, becoming overly familiar with strangers. N was struggling with language development and the impacts of physical abuse. Those evaluators agreed that all three children needed permanency.

The children express reluctance to visit mother. A demonstrates anxiety before visits and Y is very emotional and has a hard time falling asleep after visits. A has expressed that he wants to live with mother's sister and, when asked about mother, Y often changes the topic; she has indicated that she would like parents to stop hitting each other.

Mother's sister expressed a preference for adoption over a permanent guardianship because of difficulties in her relationship with mother, who she describes as "very hostile" and "constantly harassing." Mother has frequently objected to activities that mother's sister has planned for the children, including trips to visit relatives in Ohio over spring break and Christmas break, both of which were approved by the juvenile court. Regarding the Christmas trip, mother informed DHS that she intended to "report the children as

missing" and "have charges filed" if they were not back by a date that she specified, which was a day earlier than the court had approved. The history of conflicts led mother's sister to expect that there would be "[no] peace" with a guardianship, though she acknowledged that contact with mother could be possible post-adoption if the children wanted it and if mother could engage them in a healthy way.

On appeal, mother concedes that she is unfit but contends that termination is not in the children's best interest, urging that a permanent guardianship would better provide for the children's need for permanency. She maintains that she caused injury to A when she was under stress that would not be present if the children remained in a guardianship with her sister, notes that she engaged consistently and safely in visitation with the children, argues that concerns about her disrupting a guardianship are speculative despite her contentious relationship with her sister, and expresses concern that her sister might sever contact with the children post-adoption for reasons inconsistent with the children's best interests.

After reviewing the record *de novo*, we are persuaded that DHS proved by clear and convincing evidence that termination is in the children's best interest. The evidence establishes that mother's conduct toward A was abusive, and that A and Y continue to suffer trauma connected to mother's conduct and conditions and evince distress after visits. Further, the children's attachment to mother appears to be insecure, and mother's history of conflicts with her sister over decisions related to the children, along with mother's lack of progress in addressing her mental health conditions, support valid concerns about her capacity to abide by boundaries set in her contact with the children. Circumstances where, as in this case, a parent is making excuses for the conduct that supports the finding of unfitness and demonstrates a poor capacity to cooperate with the terms of a permanent guardianship counsel against a finding that a permanent guardianship serves the best interest of children. We conclude that termination of mother's parental rights is in the children's best interest on this record.

Affirmed.